UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

WILLIAM WALKER MINTO,       )
      Petitioner,       )
             )
v.       )   NOS.  2:05-CR-22
             )          2:09-CV-114
UNITED STATES OF       )
AMERICA,       )
      Respondent.       )

## MEMORANDUM  OPINION

William Walker Minto ("petitioner" or "Minto"), a federal prisoner, has filed a "Motion To
Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody," [Doc. 212], pursuant to
28 U.S.C. § 2255.  The government has not responded and the Court has determined that no response
is necessary.  The Court has also determined that the trial transcripts, transcripts of the sentencing
hearing, and the files and records in the case conclusively establish that the petitioner is not entitled
to relief under § 2255 and, therefore, no evidentiary hearing is necessary.  For the reasons which
follow, the petitioner's § 2255 motion lacks merit and the motion will be DENIED.

### I.  Procedural Background

Minto was one of five defendants named in a criminal complaint filed in this Court on
February 18, 2005, [Doc. 1], charging him with a conspiracy from on or about February 12, 2005,
to on or about February 17, 2005, to distribute and possess with the intent to distribute 1000
kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).  He
was subsequently indicted on March 8, 2005, by a federal grand jury in a one count indictment
charging him with the same offense, [Doc. 36].  On March 23, 2005, the government filed an

information pursuant to 21 U.S.C. § 851(a)(1) giving notice of the government's intention to seek increased punishment by reason of two prior felony drug convictions, i.e., on June 23, 1994 in Broward County, Florida Circuit Court, in case No. 94001296CF10A, Minto was convicted of the felony offenses of possession of cocaine and an attempt to purchase cocaine; and on July 12, 1994, in the Palm Beach, Florida Criminal Court, in case No. 93-3094CFA02, Minto was convicted of the felony offense of attempt to possess cocaine, [Doc. 42]. On May 3, 2005, the United States filed a plea agreement signed by Minto on March 8, 2005, in which he agreed to plead guilty to the indictment, [Doc. 72]. A stipulation of facts was filed on May 4, 2005, [Doc. 73].

A change of plea hearing for Minto was scheduled for June 6, 2005, [*See* Doc. 77]. On that date, Minto appeared before the Court, declined to enter a guilty plea pursuant to his plea agreement and executed a waiver of his right to jury trial, [Doc. 84]. The United States consented to the bench trial. The bench trial commenced on July 1, 2005. After the government concluded its proof on that same date, the bench trial was continued until July 22, 2005, [Doc. 97]. The trial was reconvened on July 22. No proof was offered on behalf of Minto [1] and, after arguments from counsel, Minto was found guilty of the indictment. Sentencing was set for October 3, 2005, and a presentence investigation report ("PSR") was ordered, [*see* Doc. 101].

On September 29, 2005, Minto, through counsel, filed an objection to the government's § 851 information, contending that the Palm Beach, Florida conviction relied upon by the government as a predicate conviction to enhance Minto's sentence to a minimum mandatory term of life imprisonment was not a "felony drug offense." [Doc. 133]. In the PSR prepared by the probation

---

[1] Minto seems to criticize counsel for resting without calling witnesses; however, he identifies no witnesses who could have been called on his behalf, nor does he identify any testimony which would potentially have affected the outcome of his trial.

office, the probation officer calculated a guideline range of 121 to 151 months imprisonment; however, the probation officer determined that the petitioner was subject to a minimum mandatory term of life imprisonment based upon his prior convictions. The petitioner also filed an objection to the PSR contending that he was eligible for safety valve treatment in the case. The government filed no objections to the PSR.

A sentencing hearing was conducted on November 14, 2006, after numerous delays occasioned primarily by Minto's request for, and the Court's grant of, new counsel. [2] At the sentencing hearing, the government conceded that Minto's prior Palm Beach, Florida conviction was not a qualifying predicate felony drug offense and, based upon the Broward County conviction, Minto was subject to a mandatory minimum term of 240 months or 20 years. [*See* generally Doc. 202]. After hearing proof, the Court overruled Minto's safety valve objection and Minto was sentenced to the mandatory minimum 240 months of imprisonment. *Id.* Judgment was entered on December 4, 2006, [Doc. 196], and the matter was appealed to the United States Court of Appeals for the Sixth Circuit. On August 4, 2008, the Sixth Circuit affirmed the district court's judgment, [Doc. 210], and the instant § 2255 motion was then timely filed on June 11, 2009, [Doc. 212].

## II. Factual Background

The following facts have been established by the testimony heard by the Court at the bench trial and the sentencing hearing:

### A. Trial testimony

On February 11 or 12, 2005, Minto and co-defendant, Jose Antonio Sotelo, met at an RV

---

[2] A second motion by Minto for replacement of court appointed counsel which came just prior to the sentencing hearing was denied by the Court.

park in El Paso, Texas in preparation for transporting marijuana to Johnson City, Tennessee. [Doc. 100, pp. 3-4]. They bought an enclosed trailer for $7,000, took it to a location as instructed for it to be loaded with marijuana and later returned to pick it up. [*Id*. at 4, 18]. They were to be paid $50.00 per pound to transport the marijuana. [*Id*. at 5]. The trailer was loaded with cardboard boxes filled with bales of marijuana wrapped in "feed bags" and plastic wrap to keep the marijuana from smelling and to prevent canine detection. [Doc. 200, p. 65]. Markings on the outside of the cardboard boxes indicated that they contained televisions. On February 12, Minto, accompanied by his wife, Terri, left El Paso in an RV pulling the loaded trailer; Sotelo flew to Birmingham on the 15th and was picked up at the airport by the Mintos. [Doc. 100, pp. 6-7, 20, 22].

The Mintos and Sotelo immediately headed north toward Tennessee after dropping off 11 boxes from the trailer in Atlanta at the Six Flags parking lot where they were met by an unidentified person in a big truck. [*Id.* at 8-9, 24]. The boxes to be unloaded in Atlanta were marked with a "G"; those to be delivered to Johnson City were marked with an "A." [*Id.* at 13]. The boxes unloaded in Atlanta weighed 50-60 pounds each. [*Id*. at 18].

On February 15, 2005, at approximately 10:00 a.m., the Mintos and Sotelo arrived in Johnson City and were directed by telephone to the parking of the Super K-Mart store in north Johnson City where they were to deliver the marijuana to co-defendant Ever Saul Venzor-Paredes,[3] and be paid for transporting it. [*Id*. at 12]. They were being observed by law enforcement officers who had been anticipating the marijuana shipment for about a week. [Doc. 200, pp. 14-15, 27-28]. Minto and Sotelo unhitched the trailer and were met in the parking lot by co-defendant Jose Cordero,

---

[3]  Venzor-Paredes testified that he had been hired by Jose Cordero, another co-defendant, to come from Nashville to unload the marijuana. The shipment was described by Venzor-Paredes as a "real big load" and was supposed to be approximately 2,200 pounds according to what Cordero had told him. [Doc. 200, pp. 35-40].

Venzor-Paredes and a confidential informant. [*Id*. at 20]. The officers observed the RV leave the K-Mart parking lot; the trailer was then seized, the RV stopped and the participants arrested. [*Id*. at 20, 22, 30]. The RV was searched and an RF detector, a police scanner, $3,800 in cash and three firearms were located inside. [Doc. 202, pp. 30-31, 33]. The trailer contained 20 boxes, two of which were empty, and the remaining 18 contained three to five bales of marijuana each. [*Id*. at 56]. The agents obtained calibrated industrial scales, [*Id*. at 7-8, 56], and weighed each of the 71 bales. [*Id*. at 58-59]. The bales varied in weight from six pounds to 58 pounds and the total weight was 2,013.92 pounds. [*Id.* at 64, 67]. The cardboard boxes were not weighed but the total weight included the plastic and feed bag wrappings. [*Id*. at 66].

After his arrest, Minto made several unsolicited statements to James Perkins, a special agent with Immigration and Customs Enforcement. Minto told Perkins he had begun working with the marijuana organization several months earlier after they came to his house in Georgia looking for his son-in-law, who had "ripped off" the organization. Minto told them he was willing to work off the debt. Minto made several "runs" picking up marijuana from the El Paso, Texas area. Minto said the February shipment to Johnson City was his third load of over a ton of marijuana in four months. The other two had been delivered to Atlanta. Minto told Perkins he had driven from El Paso to Birmingham to pick up Sotelo and then through Nashville to Johnson City. [*Id.* at pp. 46-51].

## B. Testimony at Sentencing Hearing

Within minutes of leaving the K-Mart parking lot, the RV driven by Minto was stopped as it proceeded onto Interstate 26, [Doc. 202 at 27]. Terri Minto was in the passenger seat of the RV and Jose Sotelo was seated behind the passenger seat. [*Id*. at 33, 66]. A loaded .38 caliber revolver was found in the front glove box between the seats. On top of the revolver was Minto's wallet and

the firearm was within easy reach of the RV's driver. [4] [*Id*. at 35, 68-69]. A loaded .25 caliber pistol was located inside a pocket behind the front passenger seat and a loaded .38 caliber Smith & Wesson model 413-3 was found in the night stand of the rear bedroom of the Minto's RV. [*Id*. at 35, 38, 66, 73]. On top of the night stand was a prescription bottle with the name of William Minto. [*Id*. at 74]. Various ammunition was found throughout the RV. [Id. at 35]. Minto told a DEA agent the firearm was "just there for protection." [*Id*. at 44]. Terri Minto claimed ownership of the firearms and said they were given to her at her father's death. [*Id*. at 45]. The trailer loaded with marijuana was not accessible from inside the RV. [*Id*.].

DEA agent Tracy Bishop testified that the firearms were the "tools of a drug dealer." [*Id.* at 35]. Agent Bishop also testified that "when you're dealing with drugs, there's always guns and money," and "if there's drugs, there's almost always guns because they're there to protect that load. It's a violent industry . . ." [*Id*. at 46]. In addition to the firearms found in the RV, officers also located an RV detector, a police scanner, a night vision scope and $3,800 in case. [*Id.* at 62, 65, 75, 77].

As noted above, although Minto declined to enter the guilty plea as he had agreed in his plea agreement, there was filed a stipulation contained in a document entitled "Agreed Factual Basis," [Doc. 73]. In that document, Minto stipulated the following:

> Through the testimony of several witnesses, to include co-conspirators, the government would demonstrate, beyond a reasonable doubt, that from approximately February 12, 2005, and continuing to on or about February 17, 2005, the defendant did knowingly, intentionally and without authority conspire with at least one other person to distribute and possess with the intent to distribute

---

[4] Minto testified at the sentencing hearing that he was unaware that the weapon was in the front console. [Doc. 202 at 93]. He did claim that it was not his wallet on top of the firearm but a business card case with a Florida identification card that he never used. [*Id.* at 103-104].

2,360 pounds of a mixture or substance containing a detectible amount of marijuana, a Schedule I, controlled substance.

On February 12, 2005, in a recorded telephone conversation, coconspirator Jose Cordero and a confidential informant acting at the direction of law enforcement agents discussed the purchase of 2100 pounds of marijuana by the informant with the 2100 pounds to be delivered on the front. During subsequent discussions to set up the 2100 pound transaction, coconspirator Cordero arranged to deliver 260 pounds of marijuana as a prelude to the larger deal.

On February 16, 2006, the informant was provided the 260 pounds of marijuana by coconspirators Cordero and Ever Saul Venzor-Paredes. During the transaction coconspirator Cordero indicated they could deliver the 2100 pounds of marijuana the next day.

On February 17, 2005, in a recorded and surveilled transaction, the confidential informant and undercover agents met with coconspirators Cordero and Venzor-Paredes in the parking lot of the Super K-Mart in Johnson City, Tennessee. Surveillance agents observed an RV motor home hitched to a trailer that was heavily loaded with cardboard boxes. Agents observed defendant Minto and coconspirator Jose Antonio Sotleo outside the RV and shortly thereafter the RV motor home was unhitched from the trailer and pulled away, followed by surveillance agents. Agents then observed the beginning action to hitch the trailer to a Uhaul provided by the confidential informant. At this time coconspirators Cordero and Venzor-Paredes were arrested and a short distance away agents stopped the RV. Defendant Minto and his wife, Terry Kay Minto, and Jose Sotelo were arrested in the RV. The RV was owned by defendant Minto and his wife and defendant Minto stated to agents that he and Mrs. Minto lived in the RV. During the search incident to arrest agents seized three firearms from the RV.

Defendant Minto admitted to agents that the owners of the marijuana he had just delivered had given him $7,000.00 four month previously to purchase the trailer he used to haul the marijuana from El Paso, TX to Johnson City, TN. They also provided him with a cell phone set to ring with a "special" ring tone when they called. Minto initially began working for these people to pay off a drug debt of his son-in-law's but after several loads Minto worked off the debt and began running marijuana loads for his own profit. Minto had not been paid for this load yet.

The above facts are stipulated by the parties as being true and correct.

Harry S. Mattice, Jr.
United States Attorney

s/D.R.Smith
5-3-05          Assistant U.S. Attorney
Date

s/William Walker Minto
Defendant

s/Tim S. Moore
Attorney for the Defendant

[Doc. 73].

### III.  Standard of Review

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255.  Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief.  If it plainly appears the movant is not entitled to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief.  *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961).  "Conclusions, not substantiated by allegations of fact with some

probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to

"reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland* 466 U.S. at 687. As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the petitioner. *Virgin Islands v. Nicholas*, 759 F. 2d 1073, 1081 (3rd Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner show counsel's

deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected, stating:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Id.* at 697.

### IV. Analysis and Discussion

Petitioner raises three general claims of ineffective assistance of counsel which he states as follows:

> Ground One: MOVANT ARGUES THAT ATTORNEY TIM S. MOORE PROVIDED INEFFECTIVE ASSISTANCE FOR FAILING TO DEMONSTRATE TO THE DISTRICT COURT THAT THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT, THAT FROM FEBRUARY 12 TO FEBRUARY 17, 2005, MOVANT CONSPIRED TO DISTRIBUTE AND POSSESS WITH THE INTENT TO DISTRIBUTE 1,000 KILOGRAMS OF MARIJUANA.

Ground Two: MOVANT ARGUES THAT ATTORNEY BRUCE POSTON WAS INEFFECTIVE FOR FAILING TO ARGUE THAT THE DISTRICT COURT ERRED BY TREATING THE MARIJUANA SEIZURE ON THE SUPER K-MART PARKING LOT IN JOHNSON CITY, TENNESSEE, AS A VIOLATION OF TITLE 21 U.S.C. SECTION 841(a)(1), IN CALCULATING DRUG QUANTITY IN DETERMINING WHETHER TO APPLY THE MANDATORY MINIMUM PROVISION UNDER TITLE 21 U.S.C. SECTION 841(b)(1)(A).

Ground Three: MOVANT ARGUES THAT ATTORNEY BRUCE POSTON PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO DEMONSTRATE TO THE DISTRICT COURT THAT MOVANT WAS NOT RESPONSIBLE FOR AT LEAST 1,000 KILOGRAMS BUT LESS THAN 3,000 KILOGRAMS OF MARIJUANA, BECAUSE IT WAS NOT KNOWN TO MOVANT OR REASONABLY FORESEEABLE TO MOVANT, NOR DID THE GOVERNMENT ESTABLISH A SUFFICIENT NEXUS TO ENHANCE MOVANT 2 LEVELS FOR A FIREARM.

[Doc. 212]. In essence, although Minto raises three separately stated claims of ineffective assistance of counsel, his claims all involve two factual determinations made by the Court at trial and sentencing: (1) Whether the proof established that the offense involved at least 1,000 kilograms of marijuana, and (2) whether petitioner was safety valve eligible. The Court therefore will address all of Minto's claims in the context of these two factual determinations.

A.      Quantity of Marijuana

As set forth above, Minto was charged in this case with a conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana. Under § 841(b)(1)(A), if the offense involves 1,000 kilograms or more of marijuana, a defendant with a prior conviction for a felony drug offense shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment or, if the offense is committed after two or more prior

convictions, a mandatory term of life imprisonment. 18 U.S.C. §§ 841(a)(1), (b)(1)(A). [5] Minto did not seriously contest at trial that he was guilty of a conspiracy to distribute and to possess with the intent to distribute marijuana; rather, his primary defense was that the offense did not involve 1,000 kilograms or more of marijuana. (*See* Trial Tr., Doc. 200, p. 23 where Minto's trial attorney stated: "The crux of what Mr. Minto wants to argue about today is the over 1,000 kilograms of marijuana.").

The proof offered at trial relative to the weight of the marijuana involved in the conspiracy charged in the indictment in this case was relatively straightforward. The Mintos and Sotelo were to be paid $50.00 per pound to transport marijuana from El Paso, Texas, on February 12. After being picked up in Birmingham, Sotelo learned that the trailer used to transport the marijuana contained 2,600 pounds of marijuana. Sotelo apparently learned that information based on a "ledger" entry of "$130,000" made by Terri Minto at the direction of William Minto. Terri Minto confirmed making the ledger entry at the direction of William Minto. [6] The uncontested testimony of Sotelo was that 11 boxes weighing 50-60 pounds each were unloaded from the trailer at the Six Flags parking lot in Atlanta, Georgia on the way to Tennessee. The marijuana recovered in Johnson City, including the feedbag and plastic wrappings but excluding the cardboard boxes, weighed 2,013.92 pounds. Thus, the gross weight of the marijuana loaded on the trailer in El Paso by the co-conspirators to be delivered to Atlanta and Johnson City weighed a minimum of 2,563.92 pounds, including the weight of the 11cardboard boxes unloaded in Atlanta and the plastic and feedbag

---

[5] Pursuant to 21 U.S.C. § 841(b)(1)(B), a defendant with a prior felony drug conviction convicted of an offense involving 100 kilograms or more but less than 1,000 kilograms of marijuana faces a mandatory minimum term of ten years of imprisonment up to a maximum of life.

[6] The ledger, located in the pocket of co-defendant Sotelo, had the following notation: "130,000 = 2,600 lbs. minus $7,000 paid for trailer."

wrappings.  Testimony at trial established that 2,200 pounds equals 1,000 kilograms.[7] No reasonable argument was made, and none is made now, that the 11 cardboard boxes and the plastic and feedbag wrappings weighed anything close to 360 pounds, which would be required to take the weight of the marijuana involved in this case under the 1,000 kilogram threshold.  Based upon these facts, the Court found, after its bench trial, that the weight of the marijuana was established, beyond a reasonable doubt, as 1,000 kilograms or more.

Minto has filed a rambling 40-page memorandum in support of his motion.  The rambling nature of the pleading makes it difficult for the Court to clearly discern the specific nature of petitioner's arguments.  As best the Court can tell, Minto claims that trial counsel was ineffective because he "failed to investigate, research, object and demonstrate or present" evidence that the case involved less than 1,000 kilograms of marijuana.  The gist of the argument is that counsel "failed to demonstrate" that there was insufficient evidence to support Minto's conviction.  He claims trial counsel had "several legitimate arguments he could and should have made."   More specifically, Minto claims that, of the 2,013.94 pounds of marijuana seized in Johnson City, "3 or 400 pounds is feedbags, grease and heavy plastic wrapping," and that the government "presented no direct evidence" of weight.  He argues that the government produced no evidence to permit an inference that the conspiracy involved 1,000 kilograms or more of marijuana.

Minto's argument fails for several reasons.  First, to the extent that he now argues that his conviction was based on insufficient evidence, the Sixth Circuit has "repeatedly held that the sufficiency of the evidence to support a conviction may not be collaterally reviewed on a Section

---

[7]    The actual weight in pounds of 1,000 kilograms of marijuana is 2,204.62262 pounds.  *See* http://www.metric-conversions.org/weight/kilograms-to-pounds.htm.

2255 proceeding." *United States v. Osborn*, 415 F.2d 1021, 1024 (6th Cir. 1969) (*en banc*). *See also Abdullah v. United States*, 2011 WL 1043265 (N.D. Ohio 2011); *Mitchell v. United States*, 2007 WL 325762 (E.D. Tenn. 2007). And secondly, to the extent that Minto argues that counsel was ineffective for failing to argue that the evidence was insufficient, the record flatly contradicts the claim. At the conclusion of the government's proof at trial, trial counsel moved for a judgment of acquittal on the specific grounds that the evidence was insufficient to establish the threshold quantity of 1,000 kilograms "especially if you take the wrapping out." [Doc. 200, pp. 61-62]. In addition, prior to the scheduled resumption of the trial on July 22, 2005, Minto, through counsel, gave notice of intent not to introduce evidence and renewed the Rule 29 motion, arguing additionally that there was no scientific evidence that marijuana was involved in the offense or that the boxes unloaded in Atlanta contained marijuana, [Doc.99]. Although Minto now argues, in conclusory fashion, that counsel had other legitimate arguments he should have made, Minto does not identify what those arguments were.

To the extent Minto alleges that counsel failed to properly investigate, research or object to evidence offered at trial, he simply makes a conclusory allegation unsupported by any factual allegations. Petitioner points to no specific testimony or evidence offered at trial concerning which counsel could have posed a meritorious objection, nor does he identify any additional witnesses or evidence counsel could have offered to compel a contrary finding. He identifies no research that counsel failed to do nor does he show how it could have affected the outcome of the case.

Although Minto frames his second claim was one directed to the performance of counsel

appointed to represent him at sentencing, [8] he recycles many of these same arguments. As best the Court can tell, the petitioner claims: (1) That Poston was ineffective "for failing to demonstrate that § 841(a)(1)(A) applies only to a defendant who has committed a single violation of section 841(a)(1)"; (2) that Poston was unaware of Circuit Court of Appeals cases holding that drug quantities triggering mandatory sentences are determined exclusively by reference to the offense of conviction; and (3) that the district court erred in aggregating the marijuana seized from the K-Mart parking lot and the 250 pounds of marijuana delivered on February 16, 2005, when the February 16 conduct was only relevant conduct for guidelines purposes.

All of these issues are related and make essentially the same claim, that is, that the distribution of 2013 pounds of marijuana on February 17, 2005, constituted a single violation of 21 U.S.C. § 841(a)(1) and cannot be aggregated with any other quantity to meet the quantity threshold

---

[8] Minto has had a rocky and unstable relationship with counsel in this case. He was represented by Tim S. Moore of Federal Defender Services of East Tennessee from February 18, 2005, through the conclusion of the bench trial. Moore moved to withdraw due to conflict with Minto after the bench trial and Bruce Poston, Esquire, was appointed on November 3, 2005, to represent petitioner, [Doc. 144]. On March 3, 2006, petitioner filed a *pro se* letter with the Court which contained a litany of complaints about his new attorney and which sought the appointment of new counsel, [Doc. 166]. On March 23, 2006, Poston moved to withdraw, citing, among other things, a conflict with petitioner on legal and sentencing issues, [Doc. 173]. Both motions were denied after a hearing on March 24, 2006, [Doc. 176]. Subsequently, Minto refused to assist counsel in preparation for the sentencing hearing or to testify at the sentencing hearing, [Doc. 202, p. 9].

After the case was appealed to the Sixth Circuit, Poston's appointment was revoked for failing to respond to the Court's show cause order regarding the filing of required forms, [Doc. 193], and new counsel was appointed by the Sixth Circuit, [Doc. 194]. On July 19, 2007, Minto wrote the Sixth Circuit requesting the Court to reject any brief filed by his newly appointed counsel due to a conflict with counsel. On July 20, 2007, counsel moved to withdraw due to the conflict. On August 6, 2007, the Sixth Circuit granted the motion to withdraw but refused to appoint replacement counsel, requiring Minto to proceed *pro se.* On September 20, 2007, Minto moved for appointment of counsel, the Sixth Circuit reconsidered, and counsel was appointed. On February 21, 2008, Minto asked the Sixth Circuit to strike the brief filed by replacement appellate counsel and moved for the appointment of new counsel. On July 29, 2008, the Sixth Circuit affirmed and denied the request for new counsel.

16

of § 841(b)(1)(A)(vii). [9]   As an initial matter, Minto's claims are premised on a misunderstanding of the Court's decision.  As noted above, the government was required to show that the case involved approximately 2,200 pounds of marijuana in order to meet the 1,000 kilogram threshold. In determining beyond a reasonable doubt that it did, the Court considered not only the 2,013 pounds of marijuana delivered to Johnson City on February 17 but also the 11 boxes weighing 50-60 pounds each  from the same load which had been delivered to the Six Flags parking lot in Atlanta, Georgia during the same trip.  Petitioner confuses this with testimony that a confidential informant, in a recorded and surveilled transaction, had met with Venzor -Paredes and Cordero on February 16, 2005, and received 250 pounds of marijuana.  There was no specific proof that this 250 pound shipment was connected to the load delivered by the Mintos and Sotelo.[10]

Minto cites, in support of his argument, *United States v. Winston*, 37 F.3d 235 (6th Cir. 1994), *United States v. Darmand*, 3 F.3d 1578 (2d Cir. 1993), and *United States v. Rodriguez*, 67 F.3d 1312 (7th Cir. 1995), and faults counsel at sentencing for not knowing about these holdings. While petitioner generally describes the holding of these cases correctly, he misapplies their holdings.  Not only do these cases not help him, they compel a result unfavorable to him.  The *Winston* case, a Sixth Circuit case, illustrates clearly the factual differences between the situation here and the one at issue there.

In *Winston*, the defendant was convicted of conspiracy to possess cocaine base with intent

---

[9]   Petitioner claims that "it's clearer than glass" that counsel was deficient for failing to raise this "deadbang winner" in the district court.

[10]   Although the Court did not consider this 250 delivery of marijuana on February 16 in determining Minto's guilt on the charged offense, the two were likely connected.  On February 12, 2005, the confidential informant had met with Cordero and Venzor-Paredes.  During the February 12 meeting both the 250 pound marijuana delivery and the larger 2000 pound delivery were discussed.

to distribute in violation of 21 U.S.C. § 846, and of two counts of aiding and abetting the possession of cocaine base with intent to distribute, in the amount of 23.4 grams and 37 grams each. Winston was arrested when his co-defendant sold 23.4 grams of crack cocaine to a confidential informant and the co-defendant informed authorities that he had gotten the crack from Winston. The police obtained a search warrant for Winston's house, where they found 37 grams more of crack. Following his conviction, Winston was sentenced to a mandatory term of life imprisonment based on an aggregated quantity under 21 U.S.C. § 841(b)(1)(A). In vacating Winston's sentence, the Sixth Circuit held as follows:

> It is obvious from the statute's face-from its use of the phrase "a violation"- that this section refers to a single violation. Thus, where a defendant violates subsection (a) more than once, possessing less than 50 grams of cocaine base on each separate occasion, subsection (b) does not apply, for there is no single violation involving "50 grams or more" of cocaine base. This is true even if the sum total of the cocaine base involved all together, over the multiple violations, amounts to more than 50 grams.

*Winston*, 37 F.3d at 240. In so holding, the Sixth Circuit found that there was no evidence linking the conspiracy involving 23 grams to the 37 grams found at Winston's house. In other words, the Sixth Circuit said that the 23.4 grams offense and the 37 grams offense were not part of the same conspiracy. The amount of drugs involved in the conspiracy, therefore, were not sufficient to justify the imposition of the enhanced sentence. *Id.* at 241.

Minto's case, however, is different. Both the delivery of marijuana to Atlanta on February 16 and the delivery of marijuana to Johnson City on February 17, although separate transactions, were clearly part of the same conspiracy. The amounts were part of the same shipment, transported on the same trailer, involved the same people, and constituted a single violation of the statute. The Sixth Circuit addressed a case more akin to the instant in *United States v. Pruitt*, 156 F.3d 638 (6th

Cir. 1998). In *Pruitt*, the court was confronted with the issue of whether a conspiracy involving multiple overt acts, *i.e.* overt acts involving individual amounts of drugs under the threshold amount required, is nonetheless "a violation" of § 841(a). Noting "that a conspiracy is a single, unified offense," and that while it "may comprise several overt acts, it has a single overall objective," The Sixth Circuit found it proper for a district court to aggregate the amounts of drugs attributable to a defendant and treat participation in an organized conspiracy as a single violation of § 841(a). *Id.* at 644-45.

In a case decided shortly after *Pruitt*, *United States v. Walker*, 160 F.3d 1078 (6th Cir. 1998), the Sixth Circuit further clarified that the *Winston* court had made it clear that a conspiracy involving an amount of drugs necessary to trigger a threshold amount for mandatory minimum sentencing purposes was a single violation within the meaning of § 841(b)(1) and "that there was [no] barrier to aggregating the separate overt acts of the conspiracy" to reach that total. *Id.* at 1094. Finding that the barrier in *Winston* was that the particular conspiracy charged and proven involved less than the threshold amount of drugs, the court held that "if the conspiracy had involved [the threshold amount], the enhanced sentence would have been appropriate," *id.,* and found "the fact that this particular conspiracy was characterized by separate transactions [ ] a fact of no legal significance." *Id.* at 1093.

Here, because Minto was involved in a single violation of the law, *i.e.* a conspiracy covering the time period February 12 through February 17, 2005, and because the quantity of drugs delivered on both February 16 and February 17 were linked to the conspiracy, it was appropriate for the Court to aggregate the two amounts in finding that the offense involved at least 1,000 grams of marijuana. Minto, therefore, committed a single violation of 21 U.S.C § 846, *i.e.* a conspiracy to violate §

841(a)(1), and the mandatory minimum sentence was appropriate.

Finally, Minto makes two additional claims of ineffectiveness on the part of attorney Poston, one of which is a complete nonstarter. He argues that Poston was ineffective "by failing to demonstrate to the district court that Movant was not responsible for at least 1,000 kilograms but less than 3,000 kilograms of marijuana, because it was not known to petitioner or reasonably foreseeable to Movant." Minto's argument relates to ¶ 16 of the PSR involving the offense level computations necessary to calculate the guidelines range. The probation officer determined the base offense level to be 32 pursuant to USSG § 2D1.1(c)(4), which calls for that base offense level for offenses involving at least 1,000 kilograms but less than 3,000 kilograms of marijuana. Based on a total offense level of 32 and a criminal history category of I, the probation officer determined the guideline range for imprisonment to be 121 to 151 months; however, because the defendant was subject to a 20 year mandatory minimum term of imprisonment, the guideline range became 240 months. As a result, the base offense level selected by the probation officer had absolutely no effect on Minto's ultimate sentence. In any event, as discussed above, the offense clearly involved at least 1,000 kilograms of marijuana and the base offense level assigned by the probation officer was correct.[11] Finally, Minto alleges that Poston's performance was deficient because "Poston should also have shown that Movant was eligible for the 'safety valve' offered by Title 18 U.S.C. § 3553(f)." Minto argues that it was "attorney Poston's job to not only demonstrate to the District

---

[11]  Petitioner also makes one other claim related to his guidelines calculation. He argues that his offense level was improperly enhanced by two levels based upon possession of a firearm pursuant to USSG § 2D1.1(b)(1). Once again, Minto is factually incorrect. Paragraph 17 of the PSR references the guideline provision; however, the two level enhancement was not applied and the government did not object to the guideline range calculation. In any event, the enhancement to the offense level for the purpose of calculating the guidelines range would have had no impact on Minto's sentence since he remained subject to the 240 month mandatory minimum sentence.

Court that the weapons were merely stored in the motor home" and "should have known that Minto was safety valve eligible." It is unclear what else Minto claims Poston should have done. Poston objected to the failure of the probation officer to apply the safety valve, the Court heard witnesses at the sentencing hearing on the issue, including extensive testimony from petitioner himself, Poston vigorously advocated Minto's position and the Court ultimately overruled the objection. Minto points to nothing else his attorney could have done. In addition, as discussed below, the Court's ruling was appealed to the Sixth Circuit.

The district court is authorized to impose a sentence below the applicable mandatory minimum sentence in a case such as Minto's if the defendant meets all of the requirements for the safety valve. *See* 18 U.S.C. § 3553(f); USSG § 5C1.2. The safety valve applies to a defendant who does not have more than one criminal history point under the guidelines, did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense, the offense did not result in death or serious bodily injury to any person, the defendant was not an organizer, leader, manager, or supervisor of the offense, and no later than the time of sentencing, the defendant truthfully provides to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or the common scheme or plan. *Id.* At sentencing, even though Minto went to trial in the case, the government conceded that Minto met all of the requirements except one and that is the issue relevant here, *i.e.*, whether Minto possessed a firearm or other dangerous weapon in connection with the offense.

As set forth above, three loaded firearms were found in the motor home occupied by the Mintos and Sotelo on February 17, 2005, immediately after they had delivered the trailer load of

marijuana to the Super K-Mart parking lot. One of the firearms was located in a glove box between the driver's seat and the passenger seat of the motor home, one was in a pocket behind the passenger seat, and another was located in a nightstand in the rear bedroom of the motor home. Also as noted above, Minto's wallet was located on the top of the firearm located in the glove compartment and a prescription bottle with his name was sitting on the nightstand where the third firearm was found.

A defendant bears the burden of proving by a preponderance of evidence that he or she satisfies all five factors to be eligible for a sentencing reduction. *United States v. Adu*, 82 F.3d 119, 123 (6th Cir. 1996). After hearing the proof at the sentencing hearing, the Court determined that Minto did not meet his burden of proving his eligibility for safety valve. Most important here, however, is the fact that Minto raised this issue on direct appeal and it was decided adversely to him. The Sixth Circuit held:

> . . . We conclude that the district court did not clearly err when it refused to apply the safety valve provisions in this case. Minto did not produce evidence to show his entitlement to a safety valve reduction. Specifically, Minto did not satisfy the second element necessary to support such a reduction because the record indicates that Minto possessed firearms in connection with the instant drug offense. This Court has approved use of the "fortress theory" in the safety valve context. *See United States v. Headrick*, 100 Fed. App'x. 533, 535-36 (6th Cir. 2004). Under the "fortress theory," a connection between firearms and drugs is established when "it reasonably appears that the firearms found on the premises controlled or owned by a defendant and in his actual or constructive possession are to be used to protect the drugs or otherwise facilitate a drug transaction." *United States v. Richardson*, 510 F.3d 622, 626 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 2072 (2008) (U.S.S.G. § 2K2.1(b)(5) sentencing enhancement for possession of a firearm in connection with a felony offense). Here, Minto was in possession of marijuana, three loaded firearms were located in close proximity to the marijuana and were accessible to Minto, and it reasonably appears that the firearms were possessed for the purpose of either defending the drugs or facilitating the drug offense. *See Id.; Headrick*, 100 Fed. App'x. at 535-36. Thus, Minto was not entitled

to a safety valve sentence reduction.

[Doc. 210, *United States v. Minto*, No. 06-6544, United States Court of Appeals for the Sixth Circuit, July 29, 2008]. The Sixth Circuit has repeatedly held that issues raised and considered on direct appeal may not be relitigated in a § 2255 motion to vacate sentence absence extraordinary circumstances. *Stephan v. United States*, 496 F.2d 527, 528-29 (6th Cir. 1974) (per curiam), *cert. denied*, 423 U.S. 861 (1975). Minto's claim related to eligibility for safety valve treatment in this case is therefore barred by the Sixth Circuit's decision and may not be relitigated in this § 2255 proceeding.

## V.  Conclusion

For the reasons set forth above, the Court holds petitioner's conviction and sentencing were not in violation of the Constitution or laws of the United States. Accordingly, his motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 will be DENIED and his motion DISMISSED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). The district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that

reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   Having examined each of the petitioner's claims  under the *Slack* standard, the Court finds that reasonable jurists could not find that this Court's dismissal of petitioner's claims was debatable or wrong.   Therefore, the Court will deny petitioner a certificate of appealability as to each claim raised.

A separate judgment will enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE